<pre>
 1              IN THE DISTRICT COURT OF THE UNITED STATES
                 FOR THE NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,      )
 4                                   )
                    Plaintiff,       )   Magistrate Baughman
 5                                   )   Cleveland, Ohio
              vs.                    )
 6                                   )   Number 1:20CR343
      MUSTAFAH OMAR HAWKINS,         )
 7                                   )
                    Defendant.       )
 8
                              - - - - -
 9              TRANSCRIPT OF PROCEEDINGS HAD BEFORE

10          THE HONORABLE WILLIAM H. BAUGHMAN

11            MAGISTRATE JUDGE OF SAID COURT,

12            ON THURSDAY, JUNE 11, 2020
                              - - - - -
13
      APPEARANCES:
14
      For the Government:            YASMINE MAKRIDIS,
15                                   Assistant U.S. Attorney
                                     801 West Superior Avenue
16                                   Cleveland, OH 44113
                                     (216) 622-3600
17
      For the Defendant:             EDWARD G. BRYAN, ESQ.,
18                                   Federal Public Defender's
                                     Office - Cleveland
19                                   750 Skylight Office Tower
                                     1660 West Second Street
20                                   Cleveland, OH 44113
                                     (216) 522-4856
21
      Official Court Reporter:       Shirle M. Perkins, RDR, CRR
22                                   U.S. District Court
                                     801 West Superior, #7-189
23                                   Cleveland, OH 44113-1829
                                     (216) 357-7106
24

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
</pre>

<u>THURSDAY SESSION, JUNE 11, 2020, AT 11:26 A.M.</u>

1          <u>THURSDAY SESSION, JUNE 11, 2020, AT 11:26 A.M.</u>

2                    DEPUTY CLERK:  All right.

3          The case before the Court today is 1:20MJ3132, the

4    United States of America versus Mustafah Omar Hawkins.

11:31:37  5                    THE COURT:  Counsel for the United States,

6    you're ready to proceed?

7                    MS. MAKRIDES:  Hi.  Yes.  Yasmine Makrides on

8    behalf of the United States, your Honor, and I am ready to

9    proceed.

11:31:44 10                    THE COURT:  And counsel for Mr. Hawkins, are

11   you ready?

12                    MR. BRYAN:  We are ready to proceed, your

13   Honor.

14                    THE COURT:  We're here today for a preliminary

11:31:54 15   hearing and detention hearing.  We will proceed first with

16   counsel presenting evidence and proffers, and then after

17   these presentations, I'll hear argument from counsel.

18          Ms. Makrides, you have any evidence or proffers?

19                    MS. MAKRIDES:  Yes, your Honor.  I do intend

11:32:17 20   to call one witness, Peter Maura of the FBI.

21                    THE COURT:  All right.

22          Is Mr. Maura --

23                    DEPUTY CLERK:  I'll get him right now.

24                    THE COURT:  Okay.

11:32:47 25          Can you hear us, Mr. Maura?

Maura - Direct

1      DEPUTY CLERK:  Looks like his audio is still

2  connecting.  Hold on a second.

3      Mr. Maura, are you there?

4      THE WITNESS:  Yes, sir.

11:33:06  5      DEPUTY CLERK:  All right.  Can you please

6  raise your right hand.

7      PETER MAURA,

8  of lawful age, a witness called by the GOVERNMENT,

9      being first duly sworn, was examined

10      and testified as follows:

11  DIRECT EXAMINATION OF PETER MAURA

12  BY MS. MAKRIDES:

13      THE COURT:  You may proceed, Ms. Makrides.

14      MS. MAKRIDES:  Thank you, your Honor.

11:33:26  15  Q.    Mr. Maura, can you please state your name?

16  A.    Peter Maura, M-A-U-R-A.

17  Q.    Where are you employed?

18  A.    The Federal Bureau of Investigation.

19  Q.    What are your duties there?  What's your title?

11:33:40  20  A.    I'm a Special Agent.  I investigate federal crime.

21  Q.    Were you involved in the investigation into

22  Mr. Mustafah Hawkins?

23  A.    Yes.

24  Q.    Can you tell us about the investigation?

11:33:50  25  A.    Yes.

Maura - Direct

1    On June 4th, a Cleveland police Detective that's

2    assigned to the Intelligence Division of Cleveland Police

3    provided the FBI with some screenshots of a Facebook profile

4    operated by a user named Majic Jordan.  It's M-A-J-I-C.

5    Jordan, common spelling.

6    The screenshots provided showed some threats that were

7    made regarding burning of portion of Cleveland and killing

8    police officers.  So from there, we opened up a federal, an

9    FBI investigation on the matter.  I logged into a Facebook

10   profile and reviewed the profile myself on the 4th, and I

11   also observed the posts that Cleveland Police provided, as

12   well as approximately ten or 12 other relevant posts, also

13   detailing violence towards the police and threats about

14   burning property.

15   Q.   Can you read those threats into the record, please?

16   A.   Yes.

17   Although chronologically, from the 31st is the first

18   threat we used in our complaint.  On or about May 31, 2020,

19   Hawkins wrote, "We finna start smoking y'all, N-word, when

20   we see y'all killing N-word, and y'all supposed to be the

21   police.  Mark my words, the change is here."

22   On or about June 1, 2020 Hawkins wrote, "These,

23   N-words y'all told me not to shoot for strong-arming my

24   fellow brothers."  A caption was made above a video of law

25   enforcement performing their duties.

Maura - Direct

1    On or about June 1, 2020, Hawkins wrote, "Bitch,

2   N-word, what curfew?  I work past 8:00.  Y'all want to get

3   shot I see, on God."

4    In response to a post another user made, Hawkins

11:35:51 5   replied, "Bruh, I ain't fucking with that ass."

6    On June 12th -- excuse me, on or about June 2, 2020,

7   Hawkins wrote, "Don't black out my name out of any posts you

8   share of mine.  Let the ass know I'm coming.  I been said

9   burn Little Italy to the fucking ground.  He was literally

11:36:16 10   40 N-word D in our way until them N-words shot that tear gas

11   and we had to stand with our N-words.  Very next night, I

12   promise to bring y'all Italian N-words on that strip on my

13   mind.

14    On or about June 2nd, Hawkins wrote, "I can assemble a

11:36:32 15   flash mob easy Sunday.  I don't give a fuck who reading

16   this, we gotta fly past them Toms in the back seat and flag

17   them."

18    And finally, in response to another user writing, "My

19   consent.  If the police ever kill me, I don't want no

11:36:47 20   fucking peace rallies, I don't want silent protests or black

21   squares on the Internet.  I want you to burn this mother

22   fucker to the ground."

23    Hawkins wrote on or about June 2, 2020, "Exactly what

24   he said, torch it.  Even Nippsy said, "Y'all better ride for

11:37:03 25   him."

Maura - Direct

1   **Q.**   Based on your training and experience, what is a tov?

2   **A.**   A tov would be slang for a Molotov cocktail.

3   **Q.**   What's that?

4   **A.**   An incendiary device often used in civil unrests,

11:37:18   5   lights things on fire.

6   **Q.**   And the Defendant's talking about Sunday.  Was

7   anything scheduled to happen that day?

8   **A.**   There was expected to be more civil unrest in the

9   Greater Cleveland area.  In Cleveland, at the Little Italy

11:37:32   10   location, specifically, there was expected to be another

11   civil protest.

12   **Q.**   And based on your reading of the messages, as well as

13   the messages surrounding those, did this appear to be a

14   joke, levity, or was it -- did you take it to be serious?

11:37:49   15   **A.**   I reviewed the profile back for essentially the entire

16   month of May and what was -- what I can see through June,

17   and there were very little joking posts.  All the posts

18   pertaining to the protest civil unrest, there was no joking

19   about that.  There was a high level of anti-police rhetoric

11:38:07   20   and violence and justifying the use of violence with

21   historical figures.

22   **Q.**   And how did you identify the user of that account?

23   **A.**   I looked through the profile pictures of the account,

24   and on one of the pictures, the user of the account had a

11:38:28   25   name tag on with -- when he took a selfie picture and on

1       that name tag was his first name, partially obstructed, and

2       his full last name.

3           I conducted a query of the Ohio driver's license

4       database system and found a name match of that name tag.

11:38:45  5   And so I pulled his driver's license picture and compared it

6       to all of the profile pictures from the selfies and

7       positively identified him based on that.

8       Q.   And did -- did you do any research into where the

9       posts were being posted from?

11:39:05 10   A.   Subsequent to our case opening, we served an exigency

11      request to Facebook and obtained IP information regarding

12      the Facebook use of that account from June 3rd and June 4th.

13          We then served exigency use requests on the IP

14      provider and discovered it was coming from a facility in --

11:39:26 15   a large portion of the IP addresses were coming from a

16      facility at Bedford Heights, Ohio.

17          So we determined from that point that there was

18      a commercial property at that address in Bedford Heights.

19      Q.   And is that in the State of Ohio, Eastern Division?

11:39:49 20   A.   Yes.

21      Q.   What did you do with that information?

22      A.   So I drafted a search warrant and a complaint to

23      arrest Mr. Hawkins and conduct a search of that facility.

24      Q.   And did you find anything when you searched that

11:40:06 25   facility?

1    **A.**    No.

2    **Q.**    What led you to Mr. Hawkins?  What happened next?

3    **A.**    So while we were preparing to effect the arrest of

4    Mr. Hawkins, we weren't sure where he was located.  So we

11:40:22  5    began a -- we served an exigent PIN request on his cellphone

6    provider.  In addition, he made posts about working, he or

7    other users on his Facebook profile had made posts about

8    working at Cleveland Clinic.  He had a name tag on one of

9    the pictures from Cleveland Clinic, and he also made a

11:40:40 10    comment about working at Amazon.  And our logical

11    investigation led us that there was a large Amazon facility

12    with hundreds if not thousand of employees, approximately

13    one mile from the location in Bedford.

14         So we sent agents to the Amazon facility as well as

11:40:58 15    the Cleveland Clinic facility and determined that he was a

16    prior part time employee at both Amazon and at a pizza

17    restaurant that service the Cleveland Clinic and he had

18    badge access for that facility.

19    **Q.**    And did that then lead you to another address where

11:41:17 20    Hawkins was located?

21    **A.**    Yes.  So the let me start with Amazon.

22         The manager at Amazon said that he was a part time

23    employee at Amazon up until on or about June 2nd; at which

24    point, they fired him for being inebriated at work.  They

11:41:36 25    transferred him from the hospital from that location.  When

1    he arrived to work that day, he was so inebriated, they

2    transferred him to the hospital.  And upon his termination,

3    they provided us, the FBI, his cellular telephone number and

4    his address in Cleveland Heights, which we then -- we then,

11:41:55 5    you know, recorded.

6         At the same time that that interview was being

7    completed, we interviewed the corporation that employed him

8    at the pizza employer, named Georgio's Pizza.  That employer

9    said he was fired approximately a month prior for being

11:42:12 10    fully inebriated.  The owner said he was either drunk or

11    high on drugs and fired him on the spot.

12         He provided a cellphone number and a home residence

13    address that matched that of the Amazon employee.  From

14    there, we got the ping, the PIN exigency request because we

11:42:30 15    had received that phone number from two reliable sources in

16    a very recent amount of time.

17    **Q.**    And where did that -- where did that phone ping?

18    **A.**    So both prior employers provided 2128 Marlindale Road

19    Cleveland Heights as his prior -- as his current residence.

11:42:48 20    And the ping that we received was -- they give you a radius

21    of about one kilometer and the ping was pinging within that

22    one kilometer.

23         So based on the, you know, the totality of those

24    circumstances, the two interviews and the ping, we believed

11:43:05 25    that he was at the Marlindale address.  So we went and

Maura - Direct

1   affected the arrest there.

2   Q.   And did you arrest Mr. Hawkins there?

3   A.   Yes, I did.

4   Q.   And did he make any statements to you?

11:43:16  5   A.   Yes.

6        So we arrested him.  We transported him to the FBI in

7   Cleveland.  He was fingerprinted and processed.  And

8   following that, I transported him from the processing area

9   of the basement of our facility up to the second floor via

11:43:32 10   the elevator.

11        And while transporting him, unprompted, Mr. Hawkins

12   said, "Damn.  All this just for trolling on Facebook?"  I

13   then told him I didn't want to talk to him and that agents

14   in the future would be able to explain everything to him and

11:43:49 15   advise him of his rights; at which point, Mr. Hawkins didn't

16   make any further statements to me.

17   Q.   And Facebook servers, are they located in Ohio or the

18   interstate?

19   A.   They're interstate.  There's none in Ohio that I know

11:44:06 20   of.

21   Q.   Okay.

22        And I know it can be difficult to see on the zoom

23   screen but you see Mr. Hawkins on the screen?

24   A.   I do not.  I just see you, ma'am.

11:44:22 25   Q.   Oh, okay.  Thank you then.  Never mind.

Maura - Cross

1          MS. MAKRIDES:  I have no further questions.

2     Thank you.

3          THE WITNESS:  Yep.

4          THE COURT:  Mr. Bryan, cross?

11:44:36  5          MR. BRYAN:  Thank you, your Honor.

6          CROSS-EXAMINATION OF PETER MAURA

7     BY MR. BRYAN:

8     Q.   Special Agent Maura, this is the first time I've

9     cross-examined somebody from my home.  So I --

11:45:04 10    A.   First time I testified this way too, sir.

11    Q.   Okay.  So I may be a little bit out of sorts but

12    anyway, just bear with me.

13         Your investigation began when you indicated that a

14    Task Force Officer, someone who worked at the Cleveland FBI,

11:45:21 15    showed you some screenshots of statements that were made on

16    a Facebook page, correct?

17    A.   Provided to the FBI, and then the FBI then forwarded

18    them to me within our system.  So, yes.

19    Q.   And obviously, I guess it was a week before this, that

11:45:42 20    there were peaceful protests in downtown Cleveland that then

21    grew into what we, I guess characterize, as a riot, correct?

22    A.   Accurate, yep.

23    Q.   Okay.

24         So -- and the situation, this is a national situation,

11:45:58 25    it's not just a local situation, there had been protests all

| | 1 | across the country and some of those protests have led to |
|---|---|---|
| | 2 | rioting throughout the country as well, correct? |
| | 3 | **A.** Yes. |
| | 4 | **Q.** Okay. |
| 11:46:10 | 5 | So the FBI has been, I guess, hypervigilant since all |
| | 6 | of this has begun as it relates to keeping a lookout, so to |
| | 7 | speak, for trouble that could arise, correct? |
| | 8 | **A.** Yes. |
| | 9 | **Q.** And one of the things that the FBI was doing to sort |
| 11:46:30 | 10 | of keep a lookout was keeping an eye on social media, is |
| | 11 | that safe to say? |
| | 12 | **A.** That's a fair assessment, yep. |
| | 13 | **Q.** Okay. |
| | 14 | And even prior to this, the FBI, it's not uncommon |
| 11:46:43 | 15 | that the FBI would investigate various social media accounts |
| | 16 | based upon things that are sometimes said on social media, |
| | 17 | correct? |
| | 18 | **A.** Correct. |
| | 19 | **Q.** Okay. |
| 11:46:56 | 20 | And would you agree with me that, I heard you mention |
| | 21 | the word rhetoric earlier.  That even before this instant |
| | 22 | time or these current times of crisis, that there are people |
| | 23 | who sometimes talk with rhetorical flare on social media? |
| | 24 | **A.** I agree. |
| 11:47:26 | 25 | **Q.** Okay. |

Maura - Cross

1          And, in fact, one of those persons is the leader of

2     our country, even Donald Trump, he likes to use social media

3     and uses Twitter, correct?

4     **A.**     I believe, yes.

11:47:38 5     **Q.**     In fact, he famously tweeted even during this conflict

6     that when you have looters, the shooting begins, when the

7     looting starts, the shooting starts, right?

8     **A.**     I don't know what the President said.

9     **Q.**     You're not familiar with that highly-publicized

11:48:01 10     statement that Donald Trump said that when the looting

11     starts, the shooting starts?

12     **A.**     Something to that effect, yes.

13     **Q.**     Okay.

14          Would you agree with me that it would be against the

11:48:11 15     law to shoot a looter unless that looter was showing a

16     threat of harm to somebody or threat of deadly force to

17     somebody?

18     **A.**     I mean I think that that's -- I don't know all the

19     circumstances to the situation that you're presenting, but I

11:48:29 20     probably wouldn't, given the limited facts that you just

21     played out.

22     **Q.**     But I mean because he was being rhetorical, he was

23     making a comment about -- he wasn't making a specific

24     threat, he was making a comment about hey, when you start to

11:48:44 25     loot, people start to shoot.

Maura - Cross

| | |
|---|---|
| 1 | But shooting a looter would be a violation of the law, |
| 2 | correct? |
| 3 | **A.** Just purely stealing from a building with no weapons, |
| 4 | is that what you're asking? |
| 11:48:58 5 | **Q.** That's correct.  Someone running out of a store with a |
| 6 | TV in their hands, law enforcement can't shoot to kill that |
| 7 | person, correct? |
| 8 | **A.** I don't believe so, no. |
| 9 | **Q.** Okay.  All right. |
| 11:49:11 10 | That's just -- that's sort of the context we're |
| 11 | looking at now, that people are making public commentary. |
| 12 | This Majic Jordan Facebook page, this is -- is this a public |
| 13 | page? |
| 14 | **A.** The posts that I observed are public.  I just served |
| 11:49:29 15 | the search warrant, and I don't know if there are private |
| 16 | matters that need to be looked at further.  I mean I'll know |
| 17 | that when the return comes back.  But, the -- |
| 18 | **Q.** Okay. |
| 19 | **A.** -- the things I spoke to you about were publicly |
| 11:49:38 20 | available, yes. |
| 21 | **Q.** So everything -- everything that you've testified to |
| 22 | thus far and everything that's in the complaint, affidavit, |
| 23 | was open for the public to see, correct? |
| 24 | **A.** Correct. |
| 11:49:50 25 | **Q.** Okay.  And it was being posted by the person |

1    purportedly to run or to possess this site, someone calling

2    themselves to be Majic Jordan, correct?

3    **A.**    That's accurate.

4    **Q.**    Okay.  But, it didn't take too much police work to

11:50:06  5    figure out who the PIN name Majic Jordan is, correct?

6    **A.**    That is accurate.

7    **Q.**    It wasn't hard for you to determine that this was

8    Majic Jordan, at least the person purporting to be Majic

9    Jordan, was Mustafah Hawkins, right?

11:50:23 10    **A.**    Right.

11    **Q.**    Okay.

12         Now, in your affidavit, it indicates this may be for,

13    the arrest warrant that you believe that he actually resided

14    in an address in Bedford Heights, Ohio, correct?

11:50:37 15    **A.**    I did believe at the time, yes.

16    **Q.**    Okay.

17         But, is it -- is it safe to say that that's a mistake,

18    that's not where Mustafah Hawkins was residing at the time?

19    **A.**    Right.  I don't think it's a mistake.  I think that at

11:50:52 20    the time I swore that affidavit, I believed that he resided

21    there because -- would you like to know why I believe that?

22    **Q.**    Yeah, please.

23    **A.**    Because the two days of IP information that Facebook

24    provided us, provided IP -- it was a hard-line IP, meaning

11:51:07 25    he was physically connected to that address and it wasn't

Maura - Cross

1    cellular.  And he was connecting from it throughout the day

2    and night.  So I believe that he was spending time there,

3    not just during the day where it would be a work address or

4    not just at night where he was potentially sleeping there,

11:51:22  5    but it was -- the day hits and night hits lead me to believe

6    he was sleeping at that address.

7    **Q.**    Okay.  You indicated that that address was -- did --

8    it's not a residence, correct?

9    **A.**    Right, it's a commercial property.

11:51:34  10   **Q.**    It's a commercial property, and I -- you know the name

11   of the property?

12   **A.**    The address of it.  I don't know if it -- it just had

13   a, you know, tenants inside of it.  I believe it was

14   actually --

11:51:49  15   **Q.**    Your affidavit -- was there a specific --

16   **A.**    There was a unit that we made.  The unit number was

17   209, that the subscriber to that IP -- that IP address came

18   back to was 23660 Miles Road, Bedford Heights, Apartment

19   209.

11:52:21  20   **Q.**    Okay.

21        But that's actually a commercial unit, correct?

22   **A.**    Yes.

23   **Q.**    And you actually searched that unit?

24   **A.**    Yes.

11:52:27  25   **Q.**    And what was that, was that some kind of business?

Maura - Cross

**A.**    It was a -- yeah, it was a business, and I interviewed

the apartment manager of that facility.

**Q.**    Okay.  Who was that?

**A.**    It was Wayne, and then the last name was Luczywo.

It's L-U-C-Z-Y-W-O.  And they indicated that they had

observed Mr. Hawkins under surveillance camera enter and

exit the commercial property and go into a different unit,

Unit 105, and that the occupant of 105 had stolen Internet

from Apartment 209 and spliced it up to five suites within

that facility.

**Q.**    Okay.

So they're saying that they did observe him on their

video, on the surveillance video?

**A.**    Correct.

**Q.**    You have a copy of that surveillance video?

**A.**    We seized three days of it.  I haven't reviewed it

yet.  Their surveillance video deletes itself after three

days.  So on the 5th, we interviewed them, seized a copy of

that surveillance video, and we have it secured here at the

FBI.

**Q.**    Okay.  But, you haven't made an ID -- an ID or an

identification; it's just that this -- Mr. Hawkins appeared

to be the person that he saw in the surveillance video?

**A.**    Accurate.

**Q.**    Does he know Mr. Hawkins or he met him or anything

Maura - Cross

1    like that?

2    **A.**    Nope.  He's not a tenant in the building.  He goes and

3    visits a tenant in that facility.

4    **Q.**    Okay.

11:54:01  5        So what you're saying is that Mr. Hawkins was visiting

6    a tenant in that facility?

7    **A.**    Right.

8    **Q.**    And who -- who was that tenant?

9    **A.**    He identified him as a man named Robert Crews.

11:54:17 10  **Q.**    Robert Crews?

11   **A.**    Yes.

12   **Q.**    Mr. Crews is -- he's --

13   **A.**    He's the signor of 105.  He's the lessee in 105.

14   **Q.**    Okay.

11:54:29 15        And what kind of business is he running out of there?

16   **A.**    The building manager believed it was some sort of

17   recording studio.

18   **Q.**    Some sort of recording studio?

19   **A.**    Yeah.

11:54:42 20  **Q.**    Okay.

21        Okay.  So that -- so that IP address doesn't lead

22   directly to Robert -- to Mustafah Hawkins, it in essence

23   leads to Robert Crews, correct?

24   **A.**    That is accurate.

11:54:59 25  **Q.**    But you do believe that Mr. Hawkins knows Mr. Crews

Maura - Cross

1    and has been in that facility to the extent he would be able

2    to use that facility's Wi-Fi?

3    **A.**    Yes.

4    **Q.**    And would he connect to that Wi-Fi with the phone or

11:55:12  5    with the computer or --

6    **A.**    I believe it was with the phone but I don't know for

7    sure.

8    **Q.**    But back to the Majic Jordan Facebook page, would you

9    agree with me that there are a lot of pictures of

11:55:29 10    Mr. Hawkins on that Facebook page?

11    **A.**    Yes.

12    **Q.**    There's a tremendous amount of traffic on that page

13    with him and his friends?

14    **A.**    Yes, they communicate daily.

11:55:39 15    **Q.**    Okay.  Okay.  And so it's a very active Facebook page?

16    **A.**    Yes.

17    **Q.**    Okay.

18         So you were able to read a lot of the communications

19    above and beyond those placed in this search warrant, excuse

11:55:54 20    me, arrest warrant?

21    **A.**    I read -- I read May and the beginning of June, yes.

22    **Q.**    Okay.

23         I want to direct your attention to those statements.

24    Okay?  You said the first one that began -- the first

11:56:13 25    communication that you had a concern about began on May

Maura - Cross

1    31st, 2020, where Hawkins wrote, "We finna to start smoking

2    y'all N-words when we see y'all N-words and y'all supposed

3    to be the police."

4         And that was the first one that drew your concern,

11:56:33 5    correct?

6    **A.**    That -- yes.

7    **Q.**    Okay.

8         And again, is there any -- there's no specificity

9    about when, where, ever; is that correct?

11:56:49 10   **A.**    Specificity, you mean he's talking about the police?

11   **Q.**    I mean the -- it says, you know, "When we see y'all

12   killing people, we'll smoke you."  So it's sort of like a

13   condition, like if you're going to kill people, we'll kill

14   you, that kind of thing?

11:57:10 15   **A.**    I mean what is the specific question you have?

16   **Q.**    Well, I mean it doesn't say we're coming to get you

17   now or anything like that.  There's not an imminent threat,

18   is there?

19   **A.**    Yeah, a condition of when the police kill, I'm going

11:57:23 20   to kill the police.  Yeah.

21   **Q.**    Okay.

22   **A.**    That's a fair agreement, yep.

23   **Q.**    Okay.

24        And then on June 1st -- and then it says on June 1st,

11:57:39 25   "These N-words all told me not to shoot for strong arming my

Maura - Cross

1    fellow brothers."

2         And I mean how do you characterize that, that

3    statement?

4    **A.**    That he believes the contrary.

11:57:57 5    **Q.**    Yeah, but what's the -- what -- do you know what the

6    person means by saying "strong arming my fellow brothers"?

7    **A.**    Yes, I watched the video that the -- that the caption

8    is above, and it's police officers arresting a man.

9    **Q.**    Okay.  Does it look like a rough arrest or something

11:58:15 10   like that?

11   **A.**    Yes, a controversial arrest.

12   **Q.**    A controversial arrest?  Okay.  And so basically,

13   again, you see it's commentary on a video of police

14   basically conducting a controversial arrest, maybe they were

11:58:35 15   going -- that person's words, "strong arming a fellow

16   brother" or whatever?

17   **A.**    No, that's -- that's Mr. Hawkins' words.

18   **Q.**    Right.

19        That's what I said.  But, the strong arming the fellow

11:58:48 20   brother, is it a commentary on the video?

21   **A.**    Correct.

22   **Q.**    Of a police video of a raw -- of a rough arrest,

23   correct?

24   **A.**    Yes.

11:58:56 25   **Q.**    Okay.

Maura - Cross

1    Then as far as the curfew, "What curfew?  I work past

2    a -- y'all want to see -- y'all want to get shot, I see."

3    That -- did you -- and that was your next concerning post

4    made by this person?

11:59:25  5  **A.**    Yes.

6  **Q.**    Okay.

7    And then on June 2nd, you said generally they were

8    talking about there were going to be other -- did we lose

9    the witness, is he still here?

11:59:39 10  **A.**    Me?  Right here.

11  **Q.**    Okay.  Sorry.

12    You said in your testimony that there were a lot of

13    rumors about other protests that were going to take place

14    and other riots that were being formed.  I remember hearing

11:59:55 15   one on the news about something going to take place in

16    Chagrin Falls out where I live and everybody in Chagrin

17    Falls boarded up all their windows, and then there wasn't

18    even a protest in Chagrin Falls.  That kind of stuff was

19    going on, correct?

12:00:09 20  **A.**    Yes.

21  **Q.**    Okay.  So people were preparing for something else to

22    happen, correct?

23  **A.**    Yes.

24  **Q.**    Okay.

12:00:16 25    More specifically, this claim, "I can assemble a flash

1    mob easy Sunday.  IDGAF," which I presume means I don't give

2    a fuck -- "who reading this.  We're going to fly past them

3    tovs in the back seat and fling them.  I know I don't --

4    IDGAF," to mean I don't -- you know, and you basically said

12:00:41  5    what IDGAF means.  And whatever.  Correct?

6    **A.**    I missed the question in that.  That statement was the

7    statement that I was concerned about, yes.

8    **Q.**    Okay.

9         Was there a flash mob or was there any evidence that a

12:00:59 10   flash mob was being formed?

11   **A.**    We arrested him on Friday.

12   **Q.**    I understand that.  But, I mean -- okay.  You arrested

13   him on Friday, you arrested him in his home on Marlindale,

14   correct?

12:01:14 15   **A.**    Yes.

16   **Q.**    You executed search warrants?

17   **A.**    No.

18   **Q.**    Okay.  Did you search the apartment at all?

19   **A.**    No.

12:01:22 20   **Q.**    Have you since searched any property associated with

21   Mr. Hawkins?

22   **A.**    I interviewed the property manager of that house.

23   **Q.**    Did they give you permission to search the home?

24   **A.**    No.

12:01:37 25   **Q.**    Okay.  So -- did you see any evidence of materials

Maura - Cross

1   needed to make Molotov cocktails like kerosene and bottles,

2   empty bottles in this case like that?

3   **A.**    No, I didn't search the facility.  I arrested him --

4   **Q.**    I'm just saying did you have any evidence of empty

12:01:57  5   bottles and kerosene and rags, anything like that?

6   **A.**    No.

7   **Q.**    Okay.

8        You have any evidence that Mr. Hawkins was associated

9   with any other individuals who could constitute a flash mob

12:02:10  10   or be part of a larger group of individuals?

11   **A.**    I mean other than his very active Facebook page, users

12   that you were talking about, who -- I guess your question is

13   does he have 40 people that he knows based on his Facebook

14   page?  Yes.

12:02:26  15   **Q.**    Okay.

16        Well I mean did you -- you've interviewed some of

17   those people?

18   **A.**    I have not.  Just based on the -- you said based on

19   observations.

12:02:34  20   **Q.**    But do you have any evidence to believe that any of

21   those people, any of those friends on Facebook are likely to

22   be involved in criminal activity?

23   **A.**    Yes, there are other people that are talking about

24   things that he's talking about on Facebook just without the

12:02:50  25   specificity that he is.

Maura - Cross

**Q.**   Okay.

     So they haven't been arrested or charged or anything like that?

**A.**   No, not yet.

**Q.**   And again, I mean this is in response to a very public, what just about everybody agrees to be excessive use of force on a black man in Minneapolis that resulted in his death?

**A.**   Yes.

**Q.**   Okay.

     So they're crying out about that -- that situation?

**A.**   Yes, sir.

**Q.**   Is that safe?

**A.**   Yes.

**Q.**   All right.

     So notwithstanding what was said, there's no evidence of Molotov cocktail material making or anything like that, correct?

**A.**   Correct, there was not.

**Q.**   Okay.

     And more specifically, I guess another June 2nd statement had been said, "Burn Little Italy to the fucking ground.  We was literally 40 N-words deep, I guess on our way until they shot that tear gas.  And we had to stand with our" -- are you -- there was no -- there was no riot in

Maura - Cross

1    Little Italy, there was even no protest in Little Italy,

2    correct?

3    **A.**    There was not.  I can't say if there was a protest.  I

4    don't know the answer to that.  I don't believe that there

12:04:12 5    was a riot there.  No.

6    **Q.**    Okay.

7        And then when they're referring to -- so there wasn't

8    anything in Little Italy that forced the police to shoot

9    tear gas, correct?

12:04:23 10    **A.**    I honestly don't know the answer to that question.

11    **Q.**    Okay.

12        Well, just based upon your experience in Cleveland,

13    there was only one event that was the original protest that

14    led to a riot where?

12:04:35 15    **A.**    On Saturday.

16    **Q.**    On that Saturday before where there was tear gas that

17    was used, correct?

18    **A.**    My knowledge, I believe Akron used some, but I believe

19    in Cleveland proper, I believe that Saturday was the only

12:04:46 20    event that I have knowledge of.

21    **Q.**    Okay.

22        So again, reference to tear gas wasn't a real event in

23    Little Italy.  It may be talking about in Cleveland when

24    they started to tear gas, you're talking about 40 N-words

12:05:09 25    deep?

Maura - Cross

1    **A.**    I don't -- I don't know what he was talking about,

2    other than what he wrote.

3    **Q.**    Okay.  Well it doesn't appear to be connected to

4    anything really, does it?  I mean it is -- we know there

12:05:23  5    wasn't a riot in Little Italy, right, and there were many --

6    it wasn't any tear gas used in Little Italy?

7    **A.**    Right.  That's not how I -- I don't read that

8    sentence, either sentence to say that it occurred in Little

9    Italy.  It said, "I been said burn N-word" -- you can say in

12:05:44 10    respond, "I been said burn Little Italy to the fucking

11    ground.  We literally 40 N-words deep until the N-words shot

12    that tear goes and we had to stand with our N-words."  That

13    was June 2nd.  That could easily have been a reference to

14    Saturday.

12:06:00 15    **Q.**    Okay.

16          Yeah, but it's basically I mean a commentary, I mean

17    there's no --

18    **A.**    Very next riot, I promise to bring -- the very next

19    riot, I bring the Italian," you know.

12:06:15 20    **Q.**    Okay.  So, "Then when we riot again, we'll go after

21    Little Italy?

22    **A.**    It can be inferred that way, yes.

23    **Q.**    Okay.

24          All right.  But, again, no -- no evidence of, other

12:06:29 25    than these statements, no evidence of organization in an

1    effort to mobilize forces to do any -- anything criminal in

2    Little Italy or anywhere else, correct?

3    **A.**    I mean I wouldn't say that.  There's other relevant

4    posts where he talks about organizing Coventry or Beachwood.

12:06:54  5    I can tell you about the dates and time -- or the dates of

6    those other posts.

7         So mobilizing, I would say he did talk to his Facebook

8    friends about mobilizing to other civil unrest events.

9    Whether you want to say he's going to go to a protest or

12:07:08  10    riot, I can't determine that.

11         But for example, on May 31st, he wrote, "Beachwood is

12    going down for sure, y'all."

13         And on -- he talks about Coventry in another -- on May

14    31st, he wrote, "Who on Coventry RN," which I believe is

12:07:25  15    right now.  "I need to know how many N-words out there,

16    heard it smacking," which that could be police are engaged

17    or it's wild there.

18    **Q.**    Are you familiar with anything happening on Coventry?

19    **A.**    I don't know.  I didn't go out there and look on May

12:07:41  20    31st.  I wasn't aware of this case until the 4th.

21    **Q.**    Or even Beachwood, I mean even historically.

22    **A.**    I know Beachwood closed the mall and so did Legacy

23    Village in Lyndhurst.  They closed their mall in

24    anticipation of unrest.  I don't know what happened there.

12:07:56  25    I don't have knowledge of events that happened there.

Maura - Cross

1    **Q.**    Could it have been in response to these Facebook

2    postings they closed everything down?

3    **A.**    I think that would be -- my guess is as good as yours.

4    **Q.**    Okay.

12:08:10  5        And then the final thing in the affidavit talks about

6    basically giving people consent, if he were ever killed by

7    the police, that he didn't want any peace rallies; he wanted

8    people to strike back?

9    **A.**    Yes, I think, "Burn this mother fucker to the ground,"

12:08:29 10   was the words he used.

11   **Q.**    Yeah.  But, again, that -- that required a condition

12   of him first being killed by the police?

13   **A.**    Yes.

14   **Q.**    Okay.

12:08:40 15       I understand that the concern, based on everything

16   that's happening right now in the country, and I commend the

17   FBI for everything they're doing and law enforcement's

18   doing, you know, in their efforts to be proactive.  But,

19   just to be clear, you don't have any evidence that

12:09:07 20   Mr. Hawkins himself was either present at a riot or

21   participated in a riot, or anything, engaged in any --

22   **A.**    I mean --

23   **Q.**    -- to burn buildings or anything like that, correct,

24   other than your concern of what was posted on the Facebook

12:09:27 25   page, not based upon any other intelligence that he's a

Maura - Cross

1    known leader of a group of people that have been engaged in

2    civil unrest?

3    **A.**    You asked me a few different questions there.

4           I do believe he participated.  On the 30th, "I'm going

12:09:45 5   back down tomorrow and no justice no sleep, N-word," which

6    would imply to me he was there at some point on the 29th or

7    30th.

8           So I do believe he participated in the civil unrest.

9    I don't have evidence -- I don't exactly know where your

12:10:02 10  question was going.  I believe he participated, yes.

11   **Q.**    So you believe he was present at the -- at the peace

12   rallies or --

13   **A.**    I don't know.

14   **Q.**    You have any evidence that he was breaking store

12:10:15 15  windows or -- from surveillance videos, you have quite a bit

16   of surveillance video of the store looting and breaking of

17   windows and stuff like that, correct?

18   **A.**    At this point, I -- I don't have knowledge that he

19   broke any windows, no.

12:10:30 20  **Q.**    You don't have -- in your -- I would say 99.9 percent

21   of your concern is based upon the statements that were

22   posted on his Facebook account, correct?

23   **A.**    Accurate, yes.

24          MR. BRYAN:  Nothing further at this time, your

12:10:49 25  Honor.

1        THE COURT:  All right.  Thank you, Mr. Bryan.

2        Any redirect limited to the scope of the cross?

3        MS. MAKRIDES:  Yes, your Honor.  Just briefly.

4        <u>REDIRECT EXAMINATION OF PETER MAURA</u>

12:10:57  5    <u>BY MS. MAKRIDES:</u>

6    **Q.**    Agent, you stated that what concerned you about these

7    posts was that it noted specific locations and specific

8    dates, correct?

9    **A.**    Yes, specific days of the week, yes.

12:11:11  10   **Q.**    And in addition, he also posted a photo of Little

11   Italy, correct?

12   **A.**    Yes, a picture of people standing, which would be

13   presumed to be Little Italy, yes.

14   **Q.**    And that photo did not only contain police officers

12:11:28  15   but also contained civilians, correct?

16   **A.**    Accurate, yes.

17   **Q.**    Okay.

18        So dispensing Molotov cocktails in an area like that

19   would not only injure law enforcement, it would necessarily

12:11:39  20   injure civilians, correct?

21   **A.**    Correct.

22   **Q.**    Okay.  Thank you.

23        MS. MAKRIDES:  I have nothing further.

24        THE COURT:  Counsel, let's take a -- let's

12:11:47  25   take a short break and then we will proceed with your

1      proffer.

2           Let's -- it's -- let's go back on the record at about

3      12:15.

4                      MR. BRYAN:  Kyle, are you still there?

12:12:05  5                      DEPUTY CLERK:  Yes, I'm here.

6                      MR. BRYAN:  Can you just put me and

7      Mr. Hawkins in a break out room until then?

8           (Thereupon, a recess was taken.)

9                      THE COURT:  I should have dismissed the

12:21:00  10     Officer before we went on break.  I -- so if he does come

11     back on, I'll do that, but otherwise, Ms. Makrides, please

12     proceed with your proffer if you have any.

13                     MS. MAKRIDES:  Your Honor, I would just

14     proffer the Pretrial Services report and that's all.

12:21:14  15          Thank you, your Honor.

16                     THE COURT:  All right.  Mr. Bryan.  Any

17     evidence or proffers?

18                     MR. BRYAN:  Your Honor, the Pretrial Services

19     report, I -- I don't have the latest version.  I have the

12:21:29  20     version I was given at the initial appearance in that

21     matter.  I don't know if it's been updated at all.  I did --

22     I did forward information to Mr. Jennings related to places

23     where Mr. Hawkins could reside if he were released on bond.

24     And Mr. Jennings indicated in his e-mail that he was going

12:21:52  25     to forward that information to Ms. Stolarik.  And so I don't

1   know if there's any information that I can substitute for,

2   or supplement to the original Pretrial Services report as it

3   relates to places where Mr. Hawkins can reside.

4           THE COURT:  Ms. Stolarik, did you get

5   information from Mr. Jennings?

6           PROBATION OFFICER:  I did, Judge.  I was

7   forwarded a name and phone number.  I tried -- it's for a --

8   and I do apologize if I butcher the name, but Arion McCann,

9   I believe is the name that I was given.

10      I wasn't able to reach him until late yesterday

11  evening, and I spoke with this gentleman about, from what I

12  was forwarded, it sounded like the Defendant told his

13  attorney that this may be a place where he could live.

14          According to my original report and my interview of

15  the Defendant, he told me lived at a boarding house but he

16  never indicated whether or not he would go back there.

17      So I don't know if he's unable to return there and has

18  to give a different address, but I spoke with the gentleman,

19  Mr. McCann last night.  He gave me a residence in -- it

20  sounds like it's the border of Lakewood/Cleveland, and I

21  apologize.  I'm reading from my notes from speaking with him

22  last night.

23      He resides in a two-bedroom house with a roommate.

24  And when I asked whether the Defendant would be able to stay

25  in that house, he told me quote, the roommate is there but

1    he may not always be there.  So he could -- the Defendant

2    could stay in that roommate's room.  It doesn't sound like

3    this is a permanent option, as there are two gentleman who

4    already live in that house, and there's not technically a

5    room available for the Defendant.

6         And speaking with him otherwise, there didn't appear

7    to be any alarming information coming from the home.  He

8    said he's known the Defendant since childhood, and that he

9    doesn't work and would be home, and that there's no firearms

10   in the home.

11              THE COURT:  Okay.

12        And there's no amended report at this time, correct?

13              PROBATION OFFICER:  No, Judge.  And I do

14   apologize.  I was given that information late last night.  I

15   can type up something to make sure that you have an addendum

16   to the report.

17              THE COURT:  All right.  All right.

18        As is -- as is my usual practice, I will probably take

19   the motion for detention under advisement.  And if you wish,

20   Mr. Bryan, I'll withhold my ruling until I get the amended

21   report.

22              MR. BRYAN:  Yes, your Honor.

23        And also just proffer for the record that I've been in

24   contact with Mr. Hawkins' mother as well, and I'm -- and

25   that's another potential placement as well, but I haven't

1    confirmed that yet.

2                    THE COURT:  All right.  Well if you get --

3                    MR. BRYAN:  In the home with her husband that

4    is not Mr. Hawkins' father.  So she had to check with him

12:25:12  5    first.  But, I --

6                    THE COURT:  If you have further information

7    then -- if you have further information, give it to Ms.

8    Stolarik for purposes of supplementing the report.

9                    MR. BRYAN:  I will do so, your Honor.

12:25:23  10                    THE COURT:  Any other proffers, Mr. Bryan?

11                    MR. BRYAN:  No, your Honor, not at this time.

12                    THE COURT:  Okay.

13         Ms. Makrides, let's go over argument.  First of all,

14    on probable cause.

12:25:32  15                    MS. MAKRIDES:  Your Honor, probable cause,

16    there has been testimony as to each and every element that

17    would be required.

18         The first, your Honor, is that the Defendant sent a

19    message in interstate or foreign commerce.  In this case,

12:25:49  20    your Honor, you heard testimony from the agent that there

21    are no Facebook servers located in Ohio.  Therefore, the

22    Facebook messages necessarily were transported in interstate

23    commerce.

24         And the second is that they contained a true threat to

12:26:03  25    injure the person of another.  The Defendant must make that

1    threat knowing that it remains a threat.

2         In this case, your Honor, you have heard testimony

3    from the agent that the Defendant's Facebook posts, Facebook

4    page, he posted a number of threats to injure law

12:26:23  5    enforcement, as well as potentially injure civilians.  Those

6    involved the use of firearms, as well as explosive devices,

7    homemade explosive devices, Molotov cocktails.  The threats

8    that were made were serious in nature.

9         It's not required the Defendant actually have ability

12:26:44 10    to carry out the threat nor that he actually intended to

11    carry it out, merely that he knowingly conveyed a threat.

12         And in this case, your Honor, based on the testimony

13    of the agent, I believe that there is probable cause to

14    believe that the Defendant violated Section 18, United

12:27:00 15    States Code, 875(c), by conveying a threat to injure the

16    person of another.

17         In regards to detention, your Honor, in looking --

18              THE COURT:  Hold on that.  We'll take them one

19    at a time.

12:27:11 20         Mr. Bryan, probable cause.

21              MR. BRYAN:  Yes, your Honor.

22         As it relates to the issue of probable cause, I think

23    there's an issue as it relates to identity.  Notwithstanding

24    the fact that it appears that this is a Facebook page

12:27:29 25    controlled by Mr. Hawkins -- and it doesn't appear that that

1    was anything that Mr. Hawkins was, you know, even trying to

2    hide -- notwithstanding the fact that it's in the name of a

3    Majic Jordan and the name of what I would call a PIN name.

4    It's very common for people to create Facebook pages where

12:27:54  5    they don't identify themselves as their actual name but by a

6    PIN name.  But it's clear this is a Facebook page associated

7    with Mr. Hawkins.  What isn't clear is that he's the one per

8    se who actually posted the Facebook post.

9        The IP address where the posts were made were to a

12:28:20  10    commercial property in Bedford Heights, not from

11    Mr. Hawkins' home.  Based upon the fact that it wasn't from

12    Mr. Hawkins' home, it was apparently registered to a

13    Mr. Crews, and it also appears to be a place where

14    apparently five units had spliced into this IP address to

12:28:50  15    get Wi-Fi.

16        The fact that multiple people have access to that IP

17    address and that it wouldn't take that much to be able to

18    log on to somebody else's Facebook, I'm not sure the

19    Government has been able to establish, even by probable

12:29:10  20    cause, that Mr. Hawkins was the one who posted the

21    statements on Facebook to begin with.

22        The only thing they have, apparently Mr. Hawkins when

23    he was being taken from one part of the FBI to the other

24    part of the FBI, according to the agent, Mr. Hawkins' words

12:29:33  25    to the effect, "Damn.  All this for -- all this for trolling

1    on Facebook?"

2         I don't know that -- I'm sure the agent characterizes

3    that as some type of an admission.  I don't know that that's

4    fair to say based upon sort of the ambiguous nature of that.

12:29:52  5         Mr. Hawkins probably had already been advised that he

6    was arrested, based upon Facebook posts and -- but there's

7    no other evidence that Mr. Hawkins acknowledged that he was

8    the one that was sending or, excuse me, posting these

9    messages.

12:30:07  10         As for the messages themselves, they vary in degree, I

11   think.  Obviously I'm not trying to minimize the seriousness

12   of what was stated in the messages, but at the same time,

13   there's very little corroboration that anything was ever

14   going to be carried out.  I would characterize the messages

12:30:28  15   themselves more along the line of rhetorical speech, speech

16   that's protected under the First Amendment, even if it's

17   offensive.

18         There are many, many instances in pop culture and rap

19   videos where the lyrics of the rap songs themselves talk

12:30:50  20   about killing the police, talk about, you know, burning

21   things down, but people recognize that those aren't serious,

22   that they're not actual threats.  It's a form of rhetorical

23   speech.  That was sort of the point I was making when I

24   quoted the President in a tweet where he said, "When the

12:31:09  25   looting starts, the shooting starts."

 1          Certainly people can argue that the President is

 2     threatening people that loot, that they will be shot, which

 3     obviously would be a threat of harm or some type of a

 4     threat.  But, in the grander scheme of things, especially in

12:31:27  5     these times of political unrest, I would submit that the

 6     statements are more rhetorical and less threatening.

 7          If you read the statute, the statute's very clear that

 8     you have to communicate for, specifically a threat, any

 9     threat to injure the person of another.  And a threat to

12:31:51 10     injure the person of another is something that is direct.

11     It's not something that people sing about in rap songs or

12     the President tweet about on his Twitter page or even

13     people, or people post about on their Facebook.

14          There's no specificity to anything, notwithstanding

12:32:17 15     names and places being mentioned, Cleveland police, Little

16     Italy, no evidence that anything ever took place in Italy,

17     Little Italy or anything was going to take place.

18          As it relates to threats involving Molotov cocktails,

19     there's no evidence that there's any materials or anything

12:32:37 20     that can be used to carry out such a threat.  So I would

21     submit that probable cause has not been met, that all the

22     Government's been able to establish is a form of rhetorical

23     speech.  Notwithstanding its offensiveness, that would be

24     protected under the First Amendment and, therefore, is not

12:32:59 25     probable cause to believe that he's committed a crime for

1    which the matter can be bound over to the Grand Jury.

2         Thank you.

3              THE COURT:  I find -- I find that the -- that

4    there is probable cause that the crime alleged in the

12:33:13   5    complaint was committed, and that the Defendant committed

6    the crime alleged and, therefore, I am binding this case

7    over to the Grand Jury for further determination of probable

8    cause.

9         Let's move on to detention.  Ms. Makrides, your

12:33:31  10    argument on detention?

11              MS. MAKRIDES:  Thank you, your Honor.

12         First in looking at the nature and circumstances of

13    the offense charged, this offense involves violent threats,

14    involves threatening use of firearms and explosives.  The

12:33:44  15    weight of the evidence against the Defendant is strong.  The

16    Defendant makes an admission during booking that all this

17    was just for trolling on Facebook.

18         There was no real Facebook post confirmed to

19    compromise the addresses in Cleveland that the Defendant

12:33:58  20    frequents from a Facebook page with the Defendant's photo

21    displayed.

22         The history and characteristics of the person.  Your

23    Honor, the Defendant has no known current employment.  He

24    was fired from two part time jobs within the last 30 days,

12:34:14  25    one of which he was terminated on June 2nd of 2020 for gross

1    intoxication.  The other one was for gross inebriation of

2    drugs or alcohol.

3         And, your Honor, also, Hawkins has no permanent

4    address.  The address on his driver's license appears to be

12:34:32  5    a vacant residence.  So at this -- based on the history and

6    characteristics of the person, I believe that he is also a

7    risk of flight.

8         Also just the nature and seriousness of the danger to

9    any person of the community would be posed by the

12:34:48 10    Defendant's release.  Your Honor, you heard about the things

11    that he was posting, the violent nature of his posts, I

12    believe that releasing him would be a danger to the

13    community.

14         As based on the nature of the plea offense, the weight

12:35:02 15    of the evidence, the Defendant's history of employment, his

16    history of use of drugs and alcohol, also, your Honor, he

17    has four prior capiases issued out of prior cases, as noted

18    in the Pretrial Services report.

19         He has a domestic violence arrest from 2018.  It

12:35:22 20    appears he completed some type of diversion program and the

21    case was dismissed.  However, an arrest for a violent

22    offense.

23         So based on those things, your Honor, we would ask

24    that you find the Defendant's a risk of flight and a danger

12:35:34 25    to the community and detain him pending trial.

1          Thank you, your Honor.

2                  THE COURT:  Mr. Bryan, your argument?

3                  MR. BRYAN:  Yes, your Honor.

4          Mr. Hawkins is 27 years old and does not have a

12:35:48  5   significant prior criminal history.  In fact, he has very

6   little criminal history at all.

7          The offenses to which Ms. Makrides refers to where

8   there were capiases issued were characterized as

9   misconduct/public transportation/MM, which I believe stands

12:36:10 10  for minor misdemeanor.

11         So what I would assume this was, was a minor

12  misdemeanor citation based upon transit police citations

13  that were issued against Mr. Hawkins while riding public

14  transportation.  And I think that it may have something to

12:36:32 15  do with riding on a bus with an expired bus pass.  But,

16  it -- it doesn't even rise to the level of a jailable

17  offense.  It rises to the level of a citable offense,

18  basically pay a fine, and the matters were eventually

19  resolved regardless.

12:36:51 20         So I don't think that that is a fair comparison as it

21  relates to say he had a prior criminal charge, and a failure

22  to appear on a prior criminal charge, that carried with it

23  significant consequences.

24         As it relates to the charged offense in this case, as

12:37:12 25  federal cases go, it's a lower-level felony, to the extent

1    that the maximum statutory penalty that Mr. Hawkins faces is

2    five years.

3         I discussed this matter with Ms. Makrides yesterday,

4    as it related to what his potential Guideline range might

5    be, and she -- she believes, and I don't have any reason to

6    disagree with her, that he would be a Base Offense Level 14,

7    which carries with it a Guideline range, based upon

8    Mr. Hawkins' criminal history of 5 to 21 months.

9         So this isn't a situation where the nature of the

10   offense, at least as it relates to his -- the threat of

11   incarceration would be such that it would cause someone to

12   be so fearful of the amount of incarceration, that they may

13   flee and abscond to avoid justice.  It just doesn't make

14   sense.

15        This is a lower-level offense.  Notwithstanding the

16   serious nature of what was posted on Facebook, there also

17   doesn't appear to be any particular will or any will at all

18   to carry out anything that was stated.  I know that it's a

19   concerning thing, especially in these days, but at the same

20   time, since his arrest or even before his arrest, the FBI

21   has not been able to get any evidence to suggest that

22   Mr. Hawkins has the ability or even the desire to carry out

23   anything that may have been posted for the benefit of his

24   friends to see on Facebook, assuming he's the one that was

25   even posting it.

1          So, again, understanding the serious nature of what

2     was said, at the same time, there's nothing about

3     Mr. Hawkins both in his history or in the charge itself that

4     would suggest that he is a flight risk or would be a danger

12:39:25 5     to the community, and I say this mostly because it's not

6     that Mr. Hawkins will just be released on bond to the

7     community; Mr. Hawkins can be released with conditions, very

8     stringent conditions this Court can impose upon him,

9     including electronic monitoring, including GPS monitoring,

12:39:48 10     including Pretrial supervision.  I don't think, including --

11     I don't think there's a drug issue, but based upon the

12     reports from his employers, there may be an alcohol issue --

13     including alcohol.  All sorts of things can be imposed to

14     allay the Court's concerns as may relate to say a potential

12:40:14 15     drinking problem or something like that.

16          Mr. Hawkins would be watched like a hawk.  There's no

17     way under these circumstances, under the circumstances of

18     Pretrial Release with conditions, that I think there can

19     even be a condition of no Internet access or not accessing

12:40:36 20     the Internet.  So the ability to even post something on

21     Facebook again can be curtailed with the conditions that

22     this Court may impose.

23          Again, I understand the concern in light of everything

24     that's happening in the world right now, but at the same

12:40:51 25     time, frequently offensive words are just that, words that,

1    the evidence that this was going to go beyond words is quite

2    frankly non-existent.

3        And balancing Mr. Hawkins' pretrial liberty interests

4    against society's safety interests, I would suggest we would

12:41:18  5    come down on the side of Mr. Hawkins' liberty, especially in

6    light of the fact that he does not have a history of

7    violence, that he also has a history of employment; albeit,

8    he may not have employment at the moment.

9        And also I would ask the Court to take a wait-and-see

12:41:39  10    as relates to his potential living arrangement.  It's my

11    understanding that he has no criminal conduct or history at

12    all.

13        He also has a very solid work history.  I don't think

14    it would be terribly inconvenient for people to -- two

12:41:59  15    people living in a two-bedroom apartment to allow another

16    friend to reside within that space.  I don't think there's

17    anything that is necessarily overcrowding, so to speak.  So

18    I don't think the appropriateness or inappropriateness of

19    that or the appropriateness of that setting has been

12:42:23  20    challenged in any great way.

21        And again, I also have a call out to his mother that

22    I'm waiting on as well.  So we will supplement that

23    information to the Court before the Court makes a final

24    ruling on this matter, and we respectfully request that

12:42:42  25    Mr. Hawkins be released on bond with whatever conditions the

1    Court deems appropriate because the Government has not

2    carried its burden in demonstrating either he's a flight

3    risk or a danger to the community when viewing all of the

4    evidence in this matter, and not just reading a Facebook

12:42:59  5    page at face value.

6         Thank you.

7              THE COURT:  Ms. Makrides, any rebuttal?

8              MS. MAKRIDES:  Just briefly, your Honor.  I --

9    the sentence that the Defendant would be facing is actually

12:43:11 10    15 to 21 months, which is significantly more than the

11    Defendant has ever faced in the past; thus, contributing to

12    him being potentially a risk of flight.

13         And also I just would note the Pretrial Services'

14    recommendation is detention, and it is for the same reasons

12:43:27 15    I cited in my initial discussion regarding the Defendant's

16    risk of flight and danger to the community.

17         I think we do have to take these threats seriously.

18    He's talking about making, you know, homemade explosives.

19    It would not take much more for the Defendant to access

12:43:44 20    these things.

21         Given the degree of violence, the number of posts that

22    we're talking about, I believe that he is a danger to the

23    community, and I would ask the Court to find that as well.

24         Thank you.

12:43:54 25              THE COURT:  The motion for detention is taken

1    under advisement.

2         Mr. Bryan, Ms. Stolarik, I will leave it to you to

3    determine if there's going to be an amended Pretrial

4    Services report.  But, I would appreciate if there is going

12:44:13  5    to be such a report, that it be given to the Court as

6    expeditiously as possible, and if there is no information

7    and there will not be an amended report, then you so advise

8    the Court so we can go ahead and make a ruling on this.

9              PROBATION OFFICER:  Yes, Judge.  Thank you.

12:44:33 10              THE COURT:  Mr. Hawkins, I am remanding you

11    back to the custody of the United States Marshal pending my

12    ruling on the motion for detention.

13         Anything further from the United States?

14              MS. MAKRIDES:  No, your Honor.  Thank you very

12:44:51 15    much.

16              THE COURT:  And anything further on behalf of

17    Mr. Hawkins?

18              MR. BRYAN:  No, thank you, your Honor.  But,

19    if we could ask to be placed in a breakout room for just a

12:44:59 20    short period of time.

21              THE COURT:  You certainly may.

22              MR. BRYAN:  Thank you.

23              THE COURT:  We'll make that arrangement.

24    Thank you.

12:45:04 25         There being no further business before the Court, we

1    are in recess.

2          (Proceedings adjourned at 12:45 p.m.)

3      DIRECT EXAMINATION OF PETER MAURA                3

4      CROSS-EXAMINATION OF PETER MAURA                 11

5      REDIRECT EXAMINATION OF PETER MAURA              31

6

7                    C E R T I F I C A T E

8          I certify that the foregoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14   s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
15   U.S. District Court - Room 7-189
     801 West Superior Avenue
16   Cleveland, Ohio 44113
     (216) 357-7106
17

18

19

20

21

22

23

24

25